UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
<u>FOR ONLINE PUBLICATION ONLY</u>

----------------------------------------------------------x
                                                          :
DEMETRIUS WILLIAMS,                                       :
                                                          :
                      Petitioner,                         :        MEMORANDUM
                                                          :        <u>AND ORDER</u>
                                                          :        10-CV-03043 (JG)
          -against-                                       :
                                                          :
JOSEPH T. SMITH,                                          :
                                                          :
                      Respondent.                         :
----------------------------------------------------------x

A P P E A R A N C E S :

          DEMETRIUS WILLIAMS
                    05A3131
                    Shawangunk Correctional Facility
                    P.O. Box 700
                    Wallkill, NY 12589
                    Petitioner, *Pro Se*

          CHARLES J. HYNES
                    Kings County District Attorney
                    350 Jay Street at Renaissance Plaza
                    Brooklyn, NY 11201
          By:       Thomas M. Ross
                    Alyson J. Gill
                    Leonard Joblove
                    Attorney for Respondent

JOHN GLEESON, United States District Judge:

          Demetrius Williams, currently incarcerated at Shawangunk Correctional Facility,

petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeking relief from his

conviction of felony murder in the second degree, rendered in Kings County Supreme Court

following a jury trial. Williams, appearing pro se, claims that the trial court (1) erroneously

declined to submit for the jury's consideration the "non-slayer" affirmative defense to felony

murder; (2) improperly permitted the introduction at trial of suggestions that Williams had

threatened or intimidated a prosecution witness and a potential witness; (3) deprived Williams of a public trial by excluding children from the courtroom; and (4) erroneously refused to suppress statements made by Williams to the police. Oral argument was held on December 1, 2010. For the reasons stated below, the petition is denied.

## BACKGROUND

A.    *The Government's Case at Trial*

    1.    *The Offense Conduct*

Demetrius Williams ("Williams") and his co-defendant and cousin Leshawn Williams ("Leshawn") were charged by indictment with, *inter alia*, three counts of murder in the second degree, including felony murder, two counts of robbery in the first degree, and robbery in the second degree. The indictment charged that, on June 27, 2003, the two men, acting in concert, stole a gold chain from Joab Thompson and, in the course of the robbery, caused his death by a single gunshot wound to the head. The cousins were tried together before separate juries. Five counts were submitted to the Williams jury, including second-degree felony murder. Trial Tr. at 848-55. The jury was instructed that if it found Williams guilty of felony murder, it should not consider the other charges. *Id.* at 847. Williams was found guilty of second-degree felony murder, *id.* at 977-979, and was sentenced to an indeterminate prison term of twenty years to life.

The government's evidence at trial established that, just after 10:30 p.m. on June 27, 2003, Thompson was found dead by fire department personnel on the second-floor landing of a stairwell in building "A" of the Carey Gardens Houses at 2946 West 23rd Street in the Coney Island section of Brooklyn. *Id.* at 54-56. Thompson had been shot in the head directly above the left eye. *Id.* at 57-58. Thompson did not live in the building, but he visited almost daily to see

his mother, Rose Campbell, who lived on the eighth floor.  *Id*. at 82.  At trial, Campbell

identified a gold chain with a medallion of the letter "D" that her son always wore.  *Id*. at 84-85.

She testified that Thompson always wore a white gold bracelet as well.  *Id*. at 83-84.

Khadija Watkins, a woman who had grown up in the area and who lived at Carey

Gardens at the time of Thompson's death, *id*. at 142-43, testified that she was the first person to

arrive at the scene after Thompson was shot.  *Id*. 146-47.  She noticed that his chain and bracelet

were gone.  *Id*. at 251-52.  Watkins testified that she was a close friend of Thompson, whom she

had known for eight or nine years.  *Id*. at 249-50.  She had also known Williams and Leshawn

for years, as they had all grown up together.  *Id*. at 144, 148-49.

2.      *Watkins's Testimony About "Yapping" Thompson*

Watkins told the jury that about two weeks before the homicide, she was in the

apartment of Quantella Harrington and Danielle Jones, two friends who lived together at 2946

West 23rd Street.  *Id*. at 147, 143.  Williams and Leshawn were with the three women in the

living room when Thompson entered and went to the back of the apartment.  *Id*. at 147-49.  After

he came in, "[e]verbody started talking about the chain [he] had around his neck."  *Id*. at 147-48.

In particular, Leshawn said he and his cousin would "yap [Thompson] for the chain," which

Watkins took to mean Leshawn intended to steal the chain.  *Id.* at 152-53.  Williams responded

to his cousin's statement by nodding his head.  *Id.*

Watkins testified that several days later, she was standing with Williams,

Leshawn, Harrington, and Jones outside the building where the murder took place.  *Id*. at 205-

206.  Thompson walked by the group, and as he passed, "Leshawn said he was going to yap him

for the chain." *Id*. Again, Demetrius "just nodded his head like, yeah, we're going to get him." *Id*.[1]

3. *The Pawning of Thompson's Chain*

Andre Wise, who had grown up in the Carey Gardens housing project, had known Williams and Leshawn since childhood. *Id*. at 363-64, 369-70. He also had known someone named Hasan Chery his whole life. *Id*. at 357-58. Wise testified that on June 28, 2003, the day after Thompson was shot, Chery and Leshawn came to see him in Manhattan, where he lived. *Id*. at 358-60. Chery and Leshawn had with them Thompson's chain, which Chery asked Wise to pawn. *Id*. at 360-62, 371 (identifying as the chain he was asked to pawn the same chain Campbell identified as her son's). The three men went together to a pawn shop, where Wise pawned the chain for $418. *Id*. at 362A, 364-66. He gave the money to Leshawn. *Id*. at 364-66. Wise testified that when Chery handed him the chain, "it looked like it was popped . . . . One of the links wasn't together." *Id*. at 366.

4. *Williams's Statement to the Police*

Detective Michael Heinrichs of the Brooklyn South Homicide Squad, *id*. at 554, and Detective John Kenny of the 60th Detective Squad, *Huntley* Tr. at 3, testified that they apprehended Williams in the late afternoon of June 30, 2003 around Surf Avenue and 24th Street and brought him to the 60th Precinct where they interviewed him later that evening. Trial Tr. at 554, 652-53, 663. During the course of the interview, Williams told the detectives that on the evening of June 27, 2003, he had been by the ball park in Coney Island watching some fireworks. *Id*. at 655. Afterwards, he returned to the building in which Thompson was later shot.

---

[1]     On the day of the homicide, Watkins was questioned by the police in the presence of a friend. *Id*. at 281-82. At that time, Watkins made no mention of the cousins' stated plan to "yap" Thompson, but instead told the police that she knew of no one who wanted to hurt Thompson. *Id*. Watkins testified that at the time she made that statement to the police, "[t]here was other people standing around," *id*. at 342, and she did not want to tell the police what she knew in the presence of others, *id*. at 342, 351-52.

*Id.* There, he met up with Leshawn, and the two of them entered the building and got onto the elevator with a number of other individuals including Thompson.  *Id.*  Williams told the detectives he had a gut feeling that something was wrong, because his cousin sometimes does crazy things.  *Id.* at 657, 666-67. He noticed a crazy look in Leshawn's eye and had a feeling that something was about to happen.  *Id.* at 688-89.  According to Williams, as he and Leshawn moved to exit the elevator, Thompson attacked Leshawn with a razor.  *Id.* at 655.  While the two men fought, Williams stepped between them and began to run down the stairway.  *Id.*  Part-way down the stairway, he heard a gunshot and looked back to see Leshawn running after him and Thompson lying on the floor.  *Id.* at 655-56, 691-92.  The cousins ran out of the building.  *Id.* at 656.

4.  *The Surveillance Tapes and Photographs*

In June 2003, Police Officer Denise McDonald was assigned to the Video Interactive Patrol Enhancement Response unit, or "VIPER," which had installed surveillance cameras in certain public housing developments.  *Id.* at 426-27.  McDonald's assignment was to monitor footage captured by cameras in and around the four buildings of the Carey Gardens project.  *Id.* at 427-28.

McDonald testified that on June 28, 2003, she was asked to review the previous day's recordings to look for footage of an individual who met the description of Thompson as provided to her by another police officer.  *Id.* at 430-31.  McDonald isolated a number of clips that were subsequently burned onto a CD and introduced as an exhibit at trial.  *Id.* at 439-40.  In her testimony, McDonald described the clips as they were played for the jury.  *Id.* at 451-57, 469-72.  In the first clip, Thompson was seen entering the building, followed by Williams and Leshawn, at approximately 10:27 p.m.  *Id.* at 453-54.  In the next clip, all three men boarded the

elevator from the lobby. *Id*. at 454. A number of other passengers were seen exiting the elevator on the second floor. *Id*. at 455. Thompson, Williams, and Leshawn rode to the eighth floor, where all three got off. *Id*. at 455-56. According to the prosecutor, the video showed Williams nodding his head repeatedly to Leshawn just before the elevator door opened on the eighth floor. *Id*. at 790. The prosecutor also pointed out what she described as "an unnatural bulge" tucked into Williams's waistband beneath his shirt, which she suggested was a gun. *Id*. at 789, 791-92.

McDonald testified that on June 28, 2003, she had also seen a clip that showed the cousins leaving the building together at approximately 10:30 p.m., but that portion of the recording had not been preserved and could not subsequently be relocated. *Id*. at 457-60. According to McDonald, a rip could be seen in Leshawn's shirt as he left the building. *Id*. at 467-68. The rip was also visible in footage taken at approximately 10:32 in a neighboring Carey Gardens building; that footage was preserved and shown at trial. *Id*. at 468-69. In addition to the video clips, the government introduced three still photographs, which were taken from the recordings and described by McDonald to the jury. *Id*. at 434.

B.      *The Suggestions of Witness Intimidation*

1.      *The Suggestion that Watkins was Intimidated*

Watkins gave inconsistent testimony at trial regarding her interactions with Williams, Leshawn, and Thompson in the days leading up to the homicide. When first asked by the prosecutor whether she had stood outside 2946 West 23rd Street with the cousins several days before the homicide, she said she had not, and she denied having heard them say anything about Thompson when he walked by. *Id*. at 154-55. The prosecutor repeated her question, and Watkins repeated her denial. 164-65. At a sidebar conference, the prosecutor told the court that Watkins's testimony conflicted with all previous statements she had made, including her grand

jury testimony. *Id*. at 155-56, 158. The judge permitted the prosecutor to speak with Watkins in the presence of defense counsel, but outside the presence of the defendants, the jury, and the court. *Id*. at 179-84.

When Watkins resumed the stand, the judge informed the jury that "during the break, I allowed the district attorney an opportunity to talk to [Watkins] about something that's been happening on the stand, so she did talk to the district attorney during the recess. And I'm going to let you know that because that might factor into your view of the testimony." *Id*. at 204-05. The third time Watkins was asked whether she was outside 2946 West 23rd Street several days before the murder with Wiliams and Leshawn, Watkins testified that she was. *Id*. at 205-06. She said that Thompson walked by, and Leshawn said he would "yap" Thompson for his chain, to which Williams agreed with a nod. *Id*. at 206. The prosecutor asked why she had earlier denied these events, and Watkins explained that she was "nervous" because "[s]omeone that was sitting on the defense side was saying something to me from over there." *Id*. at 206-07.

## 2. *The Suggestion that Harrington Was Intimidated*

Harrington did not testify at trial. Leshawn's counsel asked Heinrichs on cross-examination when he had last seen her. *Id*. at 562. Heinrichs said he had seen her a day earlier at the office of the Brooklyn District Attorney ("D.A."). *Id*. On redirect, the prosecutor asked about Harrington's "demeanor" at that encounter. *Id*. at 614. Over the objection of Leshawn's counsel, Heinrichs testified that Harrington had been "very upset and scared. . . . [S]he didn't want to be there and she said that she couldn't testify." *Id*. at 614-15. A sidebar conference followed, after which the judge told the jury "it was inappropriate for this witness to use the word 'scared.'" *Id*. at 632. He also told them "as a matter of fact that there is no allegation that Ms. Harrington ever said that either of these defendants ever threatened her in any way, shape or

form." *Id*.  Heinrichs then testified, in response to two leading questions by the prosecutor, that Harrington had been "very upset" and "uncooperative."  *Id*.

C.      *The Request for an Affirmative Defense Charge*

After the close of evidence, Williams's attorney moved to have the jury instructed in the "non-slayer" defense, New York's statutory affirmative defense to felony murder, "that . . . the defendant was not armed, he claimed not to know his companion was armed, and did not anticipate in any physical violence [sic]."  *Id*. at 719-20.  The court denied the motion, explaining that Williams had not made a showing of any of the elements of the defense.  *Id*. at 720-22.  Williams's attorney renewed his request after summations, just before the judge instructed the jury.  *Id*. at 821-23.  Again, the court declined to give the charge, because Williams had offered "no affirmative proof" that he did not have a gun.  *Id*. at 822-23.

D.      *The Trial Court's Order Excluding Children*

In preliminary proceedings before the start of trial, the trial judge ruled that small children would not be permitted in the courtroom during the course of the trial.  She gave no explanation other than that "[c]hildren do not belong in a courtroom," and said she had given the same order off the record the previous day.  Voir Dire Tr. at 489-90.  No objection to the order appears on the record.

E.      *The* Huntley/Wade *Hearing*

Prior to the start of trial, the court held a *Huntley/Wade* hearing to determine the admissibility at trial of Williams's statement to the police.[2]  Kenny and Heinrichs testified that,

---

[2]      "A *Huntley* hearing is a pre-trial proceeding to determine the admissibility of a confession or admission."  *Acosta v. Artuz*, 575 F.3d 177, 187 n.3 (2d Cir. 2009); s*ee also People v. Huntley*, 15 N.Y.2d 72, 78 (1965) ("The Judge must find voluntariness beyond a reasonable doubt before the confession can be submitted to the trial jury.").  "The purpose of a Wade hearing is to determine dehors the trial whether pretrial identification procedures have been so improperly suggestive as to taint an in-court identification."  *Twitty v. Smith*, 614 F/2d 325 (2d Cir. 1979) (citing *United States v. Wade*, 388 U.S. 218, 242 (1967)).

two days prior to Williams's arrest on June 30, 2003, Harrington and Watkins had voluntarily come to the stationhouse and independently named two cousins, "Dee" and "Shawn" Williams, in connection with the homicide. *Huntley* Tr. at 4-5, 39, 93, 110. They each identified "Dee" Williams in one of the VIPER photographs taken inside the elevator of 2946 West 23rd Street around the time of the shooting. *Id*. at 6-8. On the basis of this information, Williams became a focus of the detectives' investigation, and was arrested and brought to the 60th Precinct for questioning. *Id*. at 10-11. After several hours of waiting, Williams was questioned by Kenny and Heinrichs. *Id*. at 11, 80-81, 106-107. Before either detective asked any questions, Kenny informed Williams of his *Miranda* rights, which Williams said he understood and orally agreed to waive. *Id*. at 12-14. In response to Kenny's questions, Williams then provided his account of the events of June 23, 2003. *Id*. at 15-16, 30.

Following the hearing, the court held that Williams's statement to the police was admissible and denied his motion to suppress. Mem. Decision Denying Mot. Suppress, Apr. 20, 2005, ECF No. 12 ("Decision Denying Mot. Suppress").[3]

F.      *The Direct Appeal*

On direct appeal, Williams submitted a counseled brief and a *pro se* brief to the Appellate Division, Second Department. Each brief raised two claims. The counseled brief argued, first, that Williams was denied his right to a jury trial, to present a defense, and to due process of law by the trial court's refusal to submit for the jury's consideration the "non-slayer" affirmative defense to felony murder; and second, that Williams was denied his due process right to a fair trial "by the repeated, but baseless, hints and suggestions" that Williams and Leshawn had threatened or intimidated a prosecution witness and a potential witness. In his *pro se* supplemental brief, Williams argued, first, that his constitutional right to a public trial was

---

[3]      The state court's decision is described more fully in section E of the Discussion, *infra*.

violated when the trial court prohibited children from observing the trial; and second, that the statement he made to the police was illegally obtained, and that its admission at trial violated the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

The Appellate Division denied all four claims and affirmed Williams's conviction on November 18, 2008. *People v. Williams*, 873 N.Y.S.2d 71 (2d Dep't 2008) ("*Williams*"). On April 1, 2009, a judge of the Court of Appeals denied Williams leave to appeal. *People v. Williams*, 12 N.Y.3d 823 (2009) (Read, J.). This petition followed.

DISCUSSION

A.    *The Legal Standards for § 2254 Petitions*

1.    *Review of Unexhausted Claims*

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal habeas relief from a state court conviction is generally unavailable unless the petitioner "has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, a petitioner must fairly present his federal constitutional claims to the highest state court having jurisdiction over them. *See Daye v. Attorney Gen. of New York*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*). A petitioner has not exhausted state remedies "if he has a right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c). In New York, this includes seeking leave to appeal in the New York Court of Appeals, even though such appeal is not granted as a matter of right. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Jones v. Keane*, 329 F.3d 290, 295 (2d Cir. 2003). When a claim in a habeas petition has not been exhausted, but there are no remaining procedures available in state court for the petitioner to exhaust his claim, the petitioner will not be required to engage in a futile attempt to exhaust the claim in state court.

*See, e.g.*, *Sweet v. Bennett*, 353 F.3d 135, 140 (2d Cir. 2003).  In such cases, the federal court is required to treat the claim as procedurally defaulted.  *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001); *Sweet*, 353 F3d at 140.

2.      *Review of Procedurally Defaulted Claims*

A claim is also procedurally defaulted if the state courts explicitly refused to consider the merits of the claim because of a procedural bar.  Explicit reliance on a procedural bar preventing adjudication of the merits of a claim generally constitutes an independent and adequate state law ground for the state court's judgment, precluding federal review.  *See Harris v. Reed*, 489 U.S. 255, 260-62 (1989) (explaining rationale for habeas corpus procedural default rule); *see also Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (noting a state's interest in "channeling the resolution of claims to the most appropriate forum, in finality, and in having an opportunity to correct its own errors").  A federal habeas court may not generally review a procedurally barred claim on the merits.  Such review will be available only in the following limited circumstances.

First, a petitioner is entitled to review of a procedurally defaulted claim if he can show "cause for the default and actual prejudice as a result of the alleged violation of federal law."  *Coleman*, 501 U.S. at 750.  Second, if a petitioner cannot show cause and prejudice, his procedural default may still be excused if he can demonstrate that a fundamental miscarriage of justice would result from a failure to hear the claim on the merits – that is, "that he is actually innocent of the crime for which he has been convicted."  *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (citing *Schlup v. Delo*, 513 U.S. 298, 321 (1995)).  Third, in a "limited category" of "exceptional cases . . . exorbitant application of a generally sound rule [can] render[] the state

ground inadequate to stop consideration of a federal question." *Lee v. Kemna* 534 U.S. 362, 376 (2002) (citation omitted).

3.    *Review of State Court Adjudication on the Merits*

Whenever a state court disposes of a habeas petitioner's federal claim on the merits and reduces its disposition to judgment, regardless of whether it refers to federal law in its decision," *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001), a limited scope of review defined by AEDPA applies.  Pursuant to AEDPA, a federal habeas court may overturn a state court's ruling on the merits of a claim only if the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding."  28 U.S.C. § 2254(d).  In addition to the deference owed to state court determinations of fact under § 2254(d), subsection (e) requires that federal habeas courts presume all state court factual determinations to be correct.  The petitioner has the burden of rebutting this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

The Supreme Court has interpreted the phrase "clearly established Federal law, as determined by the Supreme Court of the United States" to mean "the holdings, as opposed to the dicta," of its decisions at the time of the state court decision.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000) ("*Taylor*").  A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Id*. at 412-13.

A decision is "an unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id*. at 413. An unreasonable application is more incorrect than a merely erroneous one, *Gilchrist v. O'Keefe*, 260 F. 3d 87, 93 (2d Cir. 2001) (citing *Taylor*, 529 U.S. at 411), but while "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence," *Gilchrist*, 260 F.3d at 93 (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted)).

B.      *The Failure to Give a Non-Slayer Instruction*

Williams's first claim for habeas relief is premised on the trial court's refusal to instruct the jury as to the non-slayer defense to felony murder. In the Second Circuit, "[i]n order to obtain a writ of habeas corpus . . . on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law." *Casillas v. Scully*, 769 F.2d 60, 63 (2d Cir. 1985). "Before a federal court may overturn a conviction resulting from a state trial in which [an erroneous] instruction was used, it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." [4] *Cupp v.*

---

[4]      In addition to the Fourteenth Amendment, Williams relies on the Sixth Amendment to support his claim. He asserts that the failure to give an affirmative defense instruction implicated not only his right to due process, but his right to a jury trial and his right to present a defense. The Supreme Court and the Second Circuit have consistently analyzed claims relating to jury instructions in terms of due process, and have held that an error in the instructions delivered to a jury does not amount to a constitutional violation unless it deprived a defendant of due process. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62 (1991); *Henderson v. Kibble*, 431 U.S. 145 (1977); *Cupp v. Naughten*, 414 U.S. 141 (1973); *Harris v, Alexander*, 549 F.3d 200 (2d Cir. 2008); *Jackson v. Edwards*, 404 F.3d 612 (2d Cir. 2005); *Davis v. Strack*, 270 F.3d 111 (2d Cir. 2001). The Supreme Court has also treated the

*Naughten*, 414 U.S. 141, 146 (1973). The same standard is applied in the Second Circuit where a habeas petitioner alleges not that an erroneous instruction was given, but that a state court erred in failing to instruct the jury as to a defense. In such cases, a writ of habeas corpus should issue "where the evidence supports [the defense] charge under state law and where the erroneous failure to give such a charge was sufficiently harmful to make the conviction unfair." *Davis v. Strack*, 270 F.3d 111, 123-24 (2d Cir. 2001).

In *Davis v. Strack*, the Second Circuit granted a habeas petition in connection with a state court's failure to charge the jury as to a justification defense. Relying on the Supreme Court's holding in *Cupp v. Naughten*, *Davis* established a three-step analysis for determining whether a state court's failure to instruct a jury as to a defense "'so infected the entire trial that the resulting conviction violates due process.'" *Id.* at 123 (quoting *Cupp*, 414 U.S. at 147).

> First, was the [defense] charge required as a matter of New York state law? Second, if so, did the failure to give the requested charge violate the standard set out in *Cupp*. Third, if so, was the

Constitution's Due Process Clauses and the Sixth Amendment as closely intertwined, recognizing that "[t]he Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." (internal quotation marks and citations omitted)). A defendant is deprived of due process where an erroneous jury charge deprives him of his right to present a defense, *see, e.g.*, *Davis*, 270 F.3d at 131 (jury instruction violated due process where it "completely deprived [defendant] of his highly credible defense to the homicide charge and guaranteed his conviction"), or of his right to a jury trial, *see, e.g.*, *Sandstrom v. Montana*, 442 U.S. 510 (1979) (jury instruction that had the effect of placing the burden on the defendant to disprove that he had the requisite mental state violates due process). Correspondingly, where an erroneous charge does not violate due process by "so infect[ing] the entire trial," *Cupp*, 414 U.S. at 147, as to call into question the resulting conviction, *see Henderson*, 431 U.S. at 156, a defendant has not suffered an injury under the Sixth Amendment. *Cf. Brecht v. Abrahamson*, 507 U.S. 619, 631, 638 (1993) (a federal habeas court may not grant relief unless constitutional error "had substantial and injurious effect or influence in determining the jury's verdict" (quotation marks omitted)). Accordingly, the approaches prescribed by the Supreme Court and the Second Circuit for analyzing jury instruction claims raised by federal habeas petitioners fully address all of Williams's arguments, including those premised on the Sixth Amendment.

> state court's failure of such a nature that it is remediable by habeas
> corpus, given the limitations prescribed by 28 U.S.C. § 2254?

*Davis*, 270 F.3d at 124; *see also Jackson v. Edwards*, 404 F.3d 612 (2d Cir. 2005) (applying the

*Davis* test where the state court failed to give a justification instruction); *Vega v. Walsh*, 258 F.

App'x 356, 357-59 (2d Cir. 2007) (holding that the *Davis* test applies where a state court fails to

instruct as to affirmative defenses as well as defenses); *Nylander v. Smith*, 07-CV-0457 (SLT),

2010 WL 1292297, at *7-8 (E.D.N.Y. Mar. 30, 2010) (applying the *Davis* test where the state

court failed to give a non-slayer instruction).

1. *Availability of the Defense as a Matter of State Law*

  Under New York Law, a person is guilty of second-degree felony murder when,

"acting either alone or with one or more other persons, he commits or attempts to commit

robbery . . . and, in the course of and furtherance of such crime or immediate flight therefrom, he

or another participant . . . causes the death of a person other than one of the participants."  N.Y.

Penal Law § 125.25(3).  Where the defendant was not the only participant of the underlying

crime, it is an affirmative defense to second-degree felony murder if the defendant:

> (a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and
>
> (b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons; and
>
> (c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; and
>
> (d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury . . . .

*Id*.  The defendant bears the burden of proving all four prongs by a preponderance of the

evidence.  N.Y. Penal Law § 25.00(2); *see also People v. Steele*, 26 N.Y.2d 526, 528 (1970)

(distinguishing "affirmative defenses" from "defenses," which the state bears the burden of disproving). However, the defendant himself need not introduce any evidence to satisfy this burden; the elements of the defense can be "established by the prosecution's own evidence, particularly by . . . statements made by . . . defendants." *People v. Santanella*, 405 N.Y.S.2d 284, 287 (2d Dep't 1978), *cert. denied sub nom Tamilio v. New York*, 443 U.S. 912 (1979).

On a defendant's request, a trial court must instruct the jury in a defense "if it is sufficiently supported by the evidence; failure to do so may constitute reversible error." *People v. Butts*, 72 N.Y.2d 746, 750 (1988). However, failure to so instruct the jury does not constitute reversible error where the evidence in the record is insufficient to support a theory that the defendant "was a nonparticipating bystander to the murder[,]" such that the jury "could not properly have returned a verdict of not guilty of felony murder based upon the establishment of the affirmative defense." *Santanella*, 405 N.Y.S.2d at 287. When determining whether to charge the affirmative defense, the court must view all evidence presented at trial in the light most favorable to the defendant. *People v. Butts*, 72 N.Y.2d 746, 750 (1988).

In Williams's case, the trial judge determined that the jury could not find any of the four elements proved by a preponderance of the evidence. Trial Tr. at 720-22, 821-23. She therefore denied Williams's request for an affirmative defense instruction. In reviewing this decision, the Appellate Division found no reversible error, as there was "no reasonable view of the evidence that would have permitted the jury to find that the affirmative defense to the charge of felony murder was established by a preponderance of the evidence." *Williams*, 873 N.Y,S.2d at 71.

Under the first step of the *Davis* analysis, I am directed to determine whether this holding was correct as a matter of New York law. In so doing, I "must of course defer to state-

court interpretations of the state's laws, so long as those interpretations are themselves constitutional." *Davis*, 270 F.3d at 123 n.4. I am instructed not to interpret New York's law pertaining to the non-slayer defense to felony murder, but instead to determine whether the evidence presented at trial was sufficient to warrant a non-slayer charge under that law as interpreted by the New York courts. *Id.*; *Jackson*, 404 F.3d at 621-22.

*Davis* instructs district courts to defer to state court interpretations of state law. But the Second Circuit has not made clear what standard of review applies to state court applications of state law in this context. Indeed, it has suggested multiple standards in reviewing state court determinations that evidence at trial was insufficient to warrant instructions under state law. In *Davis*, for example, the court appeared to give the state courts no deference in determining that they had erred in finding that the evidence at trial could not support a justification defense. 270 F.3d at 124-132; *see also Balzic v. Henderson*, 900 F.2d 534, 540-41 (2d Cir. 1990) (stating "we cannot agree" with state court determination that justification defense was unsupported by the evidence, and giving no explicit deference although decision was admittedly difficult). On the other hand, in *Jackson*, the court came to a similar conclusion only after finding that the defendant was "clearly entitled" to a justification defense in light of the evidence. 404 F.3d at 621-25; *see also Harris v. Alexander*, 548 F.3d 200, 203-05 (2d Cir. 2008) (finding erroneous the state courts' determination that an agency defense to a controlled substance charge was unavailable where the evidence viewed in the light most favorable to the defendant "*clearly* showed entitlement to have the jury instructed on the agency defense.") (emphasis added). And in *Vega*, in conducting the first prong of the *Davis* analysis, the Second Circuit found "[t]he state courts' denial of the entrapment defense . . . not in error, much less an

unreasonable determination of the facts in light of the evidence presented." 258 F. App'x at 358-59 (citing 28 U.S.C. § 2254(d)).

In Williams's case, the Appellate Division's determination that the evidence could not support a non-slayer defense under New York law was by no means unreasonable. Under New York law, the defendant bears the burden of proving all four elements of the defense. Even when viewed in the light most favorable to Williams, the evidence presented at trial at most supports a finding that Williams did not commit or aid in the homicidal act, and that Williams had no reasonable ground to believe that Leshawn intended to engage in conduct likely to result in serious injury or death.[5] No affirmative evidence supporting the remaining two prongs of the non-slayer defense was introduced. Contrary to the assertion of his counsel, in Williams's statement to police, he did not "claim[] not to know his companion was armed," Trial Tr. at 719-

---

[5]     Whether the evidence reasonably supported even these element is questionable.  In his statement to police, Williams claimed to have run from Thompson and Leshawn after Thompson pulled out a razor.  Viewed in the light most favorable to Williams, evidence that Williams ran from the scene as soon as the interaction became violent might support an inference that, prior to that moment, Williams had not anticipated any conduct likely to result in death or serious injury, and that he in no way aided the homicide.  On the other hand, the defense to felony murder can be considered only after a jury has found the elements of felony murder beyond a reasonable doubt.  In this case, the jury could only consider the defense after finding beyond a reasonable doubt that Williams intended to, and did, commit robbery.  Under New York law,

> [r]obbery is forcible stealing.  A person forcibly steals property and commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of:
>     1.  Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or
>     2.  Compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny.

N.Y. Penal Law § 160.00.  While robbery's force element does not necessarily include the likelihood of death or serious physical injury, New York case law can be read to support the conclusion that, where the predicate crime to felony murder contains an element of physical force, the non-slayer defense is unavailable.  *See People v. Solomon*, 794 N.Y.S.2d 55, 57 (2d Dep't 2005) ("[T]he evidence established that the defendant and his accomplice knowingly and unlawfully entered the victim's building with the shared intent to assault him.  The defendant therefore could not have made out, inter alia, the fourth element of the defense that he had no reasonable ground to believe that the accomplice intended to engage in conduct likely to result in serious physical injury.") (internal quotation marks and alterations omitted).  *But see People v. Cable*, 468 N.Y.S.2d 470, 476 (1st Dep't 1983)  (finding the affirmative defense to felony murder reasonably supported by the evidence where the predicate crime was robbery), *aff'd in relevant part*, 63 N.Y.2d 270, 280-83 (1984) ("[W]e agree, for the reasons stated by the Appellate Division, that the trial court erred in refusing to charge the affirmative defense to felony murder.").

20, nor did he claim to have been unarmed himself. No other evidence was introduced to show that Williams was not armed or that he had no reasonable ground to believe that Leshawn was armed. Accordingly, the Appellate Division's ruling was a reasonable application of New York law. *See People v. Caicedo*, 651 N.Y.S.2d 110, 111 (2d Dep't 1996) (affirming denial of non-slayer defense in part because defendant's statement, admitted into evidence, failed to "establish that he lacked knowledge that one of the participants had a gun, only that he did not see a gun"); *People v. Jones*, 558 N.Y.S.2d 774, 774-75 (4th Dep't 1990) (affirming denial of non-slayer defense where defendant's statement to police "failed to establish the essential elements of the affirmative defense that defendant 'had no reasonable ground to believe' that his accomplice was armed with a dangerous instrument and 'had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury'" (citing N.Y. Penal Law § 125.25(3)).

Finally, I note that in some cases New York courts have treated the non-slayer defense more like a defense than an affirmative defense, finding it appropriate to charge the defense as long as the evidence does not foreclose one or more of its elements, even where the defendant cannot point to evidence affirmatively supporting all four elements. *See, e.g. Cable*, 468 N.Y.S.2d at 476 (trial court's failure to charge the defense was erroneous where, *inter alia*, the evidence did not show defendant knew her accomplice was armed), *aff'd in relevant part*, 63 N.Y.2d at 280-83. And the evidence presented at Williams's trial did not necessarily foreclose any of the four elements of the affirmative defense. In other words, the jury could reasonably have concluded that Williams did not participate in, and reasonably did not anticipate, the homicide, even if the evidence could not support a conclusion that each element of the defense was more likely true than not.

But even if I am to accord no deference to the state court's application of state law in determining that Williams was not entitled to a non-slayer instruction, there is no basis for relief here. In light of the federalism concerns that permeate all aspects of federal habeas review, it is hardly the appropriate mechanism for ironing out wrinkles in state law like the one described above. More to the point, it is unnecessary in this case, because even if the state courts erred as a matter of state law in determining that Williams was not entitled to the charge, as discussed below, the failure to give the charge did not constitute a violation of due process and thus does not satisfy the standards established by 28 U.S.C. § 2254(d) for a grant of federal habeas relief. *See Davis*, 270 F.3d at 124.

2. *Due Process Implications of the Failure to Give the Instruction*

Even if the trial court's refusal to instruct the jury as to the non-slayer defense constituted a violation of state law, Williams's claim is not cognizable on federal habeas review because the failure to instruct did not rise to the level of a due process violation. *See McKinnon v. Superintendent, Great Meadow Correctional Facility*, 355 F. App'x 469, 474 (2d Cir. 2009) (any error that does not rise to constitutional dimensions is not cognizable under federal habeas review); 28 U.S.C. § 2254(a) (a federal district court may issue a writ of habeas corpus to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States"); *see also DiGugliemo v. Smith*, 366 F.3d 130 (2d Cir. 2004) ("'[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'") (quoting *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)).

To amount to a constitutional violation, failure to give a jury instruction must "'so infect[] the entire trial that the resulting conviction violates due process.'" *Davis*, 270 F.3d at 131 (quoting *Cupp*, 414 U.S. at 147)). This standard is not met where the instruction would not

have affected the verdict.  *Henderson v. Kibble*, 431 U.S. 145, 156 (1977); *Balzic*, 900 F.2d at

541.  I find that the trial court's failure to give an affirmative defense instruction in Williams's

case did not influence the jury's verdict.

Williams presented a defense to the felony murder charge distinct from the non-

slayer defense.  His attorney argued that the government had not proved Williams guilty of the

predicate crime of robbery.  In closing, defense counsel focused on the testimony about

Williams's head nods in response to Leshawn's comments about "yapping" Thompson.  Trial Tr.

at 763-64.  Williams's counsel contended that this testimony was both unreliable and insufficient

to prove Williams's intent to rob Thompson.  *Id*.  Defense counsel also addressed the missing

video footage and the absence of any evidence indicating that Leshawn and Williams left the

building together after exiting the elevator with Thompson.  *Id*. at 764-68.  Finally, defense

counsel emphasized Williams's statement to the police and Wise's testimony about Leshawn

arriving without Williams to pawn the chain, and he urged the jury to infer from this evidence

that Williams did not participate in the robbery.  *Id*. at 771-73.  Unlike in *Davis*, the trial court's

refusal to charge the defense did not deprive Williams of his only credible defense to the

homicide charge.  *See Davis*, 270 F.3d at 131.

More importantly, the jury rejected defense counsel's version of events.  In

finding Williams guilty of felony murder, the jury necessarily found that Williams participated in

the robbery.  To make this determination, the jury must have disbelieved that Williams ran from

Thompson and Leshawn before any confrontation occurred.  It must also have found that

Williams intended to, and did, exert physical force over Thompson in order to steal a chain from

around his neck.  It is therefore highly unlikely that the jury would have found, by a

preponderance of the evidence, that Williams reasonably could not have anticipated conduct

likely to result in serious bodily injury.  Further, the only evidence presented to the jury bearing on Williams's mindset at the time of the robbery were his statement to the police about the crazy look in Leshawn's eye, his awareness of his cousin's tendency to do crazy things, and his gut feeling that something was about to happen.  If anything, these statements refute, rather than support, the argument that Williams had no reasonable ground to anticipate violence.

Even if a non-slayer charge was warranted under New York law, there is "no basis to conclude that a jury would have responded differently had the charge been given." *Balzic*, 900 F.2d at 543.  Accordingly, the denial of the charge did not rise to the level of a constitutional violation.

3.  *Availability of Federal Habeas Relief for Failure to Give the Instruction*

Even if I concluded that Williams's due process right was violated, I could not grant a writ of habeas corpus unless the state court's denial of Williams's due process claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) ("[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.").

The Appellate Division denied Williams's constitutional claim on the merits, because it found there was "no reasonable view of the evidence that would have permitted the jury to find that the affirmative defense to the charge of felony murder was established by a preponderance of the evidence." *Williams*, 873 N.Y.S.2d at 71.  This reasoning – that failure to give an instruction is not an error of constitutional dimensions where the instruction "would not

have affected [the jury's] verdict," *Henderson*, 431 U.S. at 156 – was in line with Supreme Court precedents. The Appellate Division's determination that the jury could not reasonably have found the non-slayer defense established by a preponderance of the evidence was based in part on an interpretation of New York state law and in part on a determination of the facts in evidence. For the reasons stated above in Sections B.1 and B.2, neither aspect of the Appellate Division's conclusion can be deemed unreasonable.

For all the foregoing reasons, Williams's jury instruction claim provides no basis for federal habeas relief.

C.      *The Suggestions of Witness Intimidation*

Williams claims that his due process right to a fair trial was violated by the admission of testimony that suggested he had intimidated a government witness and a potential witness.

1.      *Factual Background*

a.      *Suggestion that Watkins was Intimidated*

On February 8, 2005, more than two months before the start of trial, the court commenced a *Huntley/Wade* hearing. Part-way through, the hearing was adjourned until just before the start of trial, *Huntley* Tr. at 88-89, because during the initial phase of the hearing, the defense counsel was prohibited from asking any questions that might reveal the identity of four witnesses – including Watkins, *see id.* at 93 – who had provided information to the police and the D.A., *see e.g.*, *id.* at 37-38, 66-70. The prosecutor repeatedly expressed concern for the witnesses' safety. *See e.g.*, *id*. at 37. When Williams's attorney asked for a record of threats made to the witnesses, the prosecutor replied:

> [P]rior to the indictment of the defendants, one witness was
> approached and said . . . something to the effect that it was

23

> believed that this person was – I don't remember if the word was
> 'snitching' was used or speaking to the police, and that they were
> aware of it and that was specifically by one of the defendants.  I
> don't remember which one right now.  Then another individual
> was approached . . . and was made aware that they were concerned
> about the witness' potential cooperation, and both individuals have
> felt very afraid and have been dealing with the District Attorney's
> Office for some time now because of it.

*Id*. at 48.

On April 25, 2005, three days before Watkins was to testify at trial, the prosecutor informed the court that David Walker, an investigator hired by defense counsel, had approached Watkins on the street and said he wanted to talk to her.  Trial Tr. at 488.  Watkins reportedly told Walker she did not want to speak to him and was afraid for her safety, but Walker continued to follow her, calling out her name, and drawing the attention of people in the area.  *Id*.

The following day, on April 26, 2005, the prosecutor reported having again spoken to Watkins, who said she had been evicted by the woman who owned the apartment in which she had been staying.  *Id*. at 48-49.  Supposedly, Walker had come to the house and told the landlady that Watkins was a drug user and was cooperating with the police and would testify at a trial.  *Id*.  The landlady was afraid for her safety and so told Watkins to move out, leaving Watkins with nowhere to go.  *Id*.  Watkins told the prosecutor she was reluctant to testify in light of what she perceived as harassment.  *Id*. at 49.

On the day before Watkins's testimony, April 27, 2005, the judge issued a material witness order, but Watkins arrived at court on April 28 of her own volition.  *Id.* at 125.  Although Watkins came voluntarily, the prosecutor reported that she was afraid to testify in the defendants' presence in light of Walker's activities, and the prosecutor asked the court to explain to her that she was required to testify in open court.  *Id*. at 126.  The court granted the prosecutor's request over the objections of both defendants.  *Id*. at 127-28.  Outside the presence

of the defendants and the public, Watkins told the court she was scared because "where I live at

. . . everybody knows that [Walker] was talking to me about the case[, a]nd the defendant's [sic]

have numbers to people where I life [sic] that they can call them that I was in court."  *Id.* at 129-

30.  However, Watkins stated unequivocally that she had not been threatened.  *Id.*

   After a recess, the prosecutor reported to the court that Watkins had been

"sobbing for the last 20 minutes" and had asked to be put in jail, as she would not testify.  *Id.* at

133.  Ultimately, however, she decided to testify.  *Id.*  Leshawn's counsel expressed some

concern about the inferences the jury might draw should Watkins be put on the stand and then

refuse to testify.  *Id.* at 134-35.  The judge responded that he would instruct the jury not to draw

any negative inferences, as "[t]his has nothing to do with the defendants having said or done

anything to her."  *Id.* at 135.

   Watkins took the stand and began to testify, but part-way through the direct

examination, the prosecutor asked for permission to treat Watkins as a hostile witness,

explaining outside the jury's presence that Watkins' testimony differed from all previous

statements she had made – including her grand jury testimony – about her interactions with

Williams, Leshawn, and Thompson in the days leading up to the homicide.  *Id.* at 155-156, 158.

In particular, she denied having stood outside 2946 West 23rd Street with Williams and Leshawn

when Thompson walked by several days before the homicide, and she denied having heard

Williams and Leshawn say something about Thompson at that time.  *Id.* at 154-55.  The judge

denied the prosecutor's request to treat Watkins as a hostile witness, because "I don't quite know

whether she doesn't remember, or whether she's got another day confused, or whether maybe

she wasn't telling the truth before."  *Id.* at 158-59.  Over defendants' objection, the judge

allowed the prosecutor to ask Watkins again about the interactions she had previously testified to. *Id*. at 161-63.

Upon resumption of the direct examination, Watkins again denied having stood outside the building with Williams and Leshawn. *Id*. at 164-65. At a sidebar conference, the prosecutor renewed her request to treat Watkins as a hostile witness and to impeach her. *Id*. at 165-66. The judge again denied the request. *Id*. at 174. The prosecutor asked to take Watkins off the stand and speak with her briefly before resuming the examination. *Id*. at 175-76. Defendants objected. *Id*. at 176-178. The judge expressed concern about allowing Watkins to change her testimony and explain the change to the jury:

> I think what concerns me about what was said out of the presence of the jury was that she was afraid of the defendants. So if you bring her in and you ask her if anything made her nervous, chances are very good she's going to say that the defendants being here make her nervous. The implication is that the defendants have done something, and they haven't. I am concerned about that.

*Id*. at 178.

Nonetheless, citing *People v. Branch*, 83 N.Y.2d 663 (1994), in which similar procedures were found properly within the trial court's discretion, the judge granted the prosecutor permission to talk to Watkins, if she consented, in the presence of defense counsel but outside the presence of the defendants, the jury, the public, and the court. *Id*. at 179-184. The judge ruled that she would inform the jury, when Watkins resumed the stand, that Watkins and the prosecutor had spoken in the interim, and she would allow defense counsel in their summations to argue that improper coaching may have led Watkins to change her testimony. 181-83.

In their private conference held in the presence of defense counsel, Watkins told the prosecutor she had changed her testimony because a member of the public whom she

believed to be Williams's girlfriends had been making eye contact with Watkins as she testified, and had been bobbing her head and mouthing things to Watkins. *Id*. at 185-86, 190. Watkins agreed to testify truthfully going forward. *Id*. at 187. The prosecutor asked the court to allow Watkins to explain any change in her testimony to the jury. *Id*. at 191-92. Leshawn's counsel objected, because "[i]f she is going to be allowed to get on the stand and say somebody was mouthing something in the third row that caused me to become uncomfortable, then we are going to now make a leap that it was somebody's girlfriend, and that there is somehow an inference to be drawn there . . . . I think it's highly suggestive and completely impermissible." *Id*. at 193. Williams' counsel also objected to the prejudice his client would suffer from the intimation that Watkins had been threatened by his client. *Id*. at 201-03.

Despite these objections, the court ruled that Watkins would be permitted to testify that a member of the public had made her nervous, because such testimony was not equivalent to testifying that she had been threatened. *Id*. at 194. Furthermore, since the jury would be told the prosecutor had conferred with Watkins, "absent some explanation for why she changed her testimony, it would look exactly the way the People anticipate, bullying her into changing her testimony." *Id*. at 199-200. In accordance with her earlier ruling, before Watkins resumed her testimony, the judge instructed the jury that "during the break, I allowed the district attorney an opportunity to talk to [Watkins] about something that's been happening on the stand, so she did talk to the district attorney during the recess. And I'm going to let you know that because that might factor into your view of the testimony." *Id*. at 204-05.

This time, Watkins's testimony was in conformity with her prior statements and in contradiction to the testimony she had given earlier that day. The prosecutor asked why she

had been untruthful earlier, and Watkins responded that she was "nervous" because "[s]omeone that was sitting on the defense side was saying something to me from over there." *Id*. at 206-07.

      b.    *The Suggestion that Harrington Was Intimidated*

On cross-examination of Detective Heinrichs, Leshawn's counsel asked him when he had last seen Quantella Harrington, who did not testify at trial. *Id*. at 561. Heinrichs replied that he had seen her the day before in the Brooklyn D.A.'s office. *Id*. On redirect, the prosecutor asked Heinrichs about Harrinton's "demeanor" when he saw her in the D.A.'s office. *Id*. 614. The judge allowed Heinrichs to answer over the objection of Leshawn's counsel, and the following exchange took place:

> [HEINRICHS:]    She was very upset and scared.
> [LESHAWN'S COUNSEL:]    Objection to "scared."
> THE COURT:    Sustained. Her demeanor. Not – her look.
> [HEINRICHS:]    Her look? She looked fine.
> THE COURT:    Was she upset? What do you mean? When she
>     was upset, what was she doing?
> [HEINRICHS:]    [The prosecutor] was speaking to her regarding
>     the case and she was very upset. She wanted, you know,
>     she didn't want to be there and she said that she couldn't
>     testify.
> [LESHAWN'S COUNSEL:]    Objection.
> THE COURT:    Sustained.
> [LESHAWN'S COUNSEL:]    Move to strike the entire line of
>     questioning.

*Id*. at 614-15. Before the judge could respond to the motion to strike, the prosecutor requested a conference at sidebar. *Id*. at 615.

      During the conference, the prosecutor acknowledged she had asked about Harrington's demeanor because she was concerned about a missing witness charge, and she argued that the defense had opened the door to such questions by asking when Heinrichs had last seen Harrington. *Id*. at 615-16. The judge reprimanded the prosecutor, saying "[t]hat's not the

kind of thing you just can tell in front of jurors.  You come in, you make application [sic] to the court . . . . You don't do it this way."  *Id*.

The prosecutor informed the judge that Harrington had told her and an investigator that she would do anything to avoid taking the stand, because she could not "comprehend what these two [cousins] were capable of," and she feared for "her safety and for her child."  *Id*. at 617-18.  She claimed that she had never identified the cousins in connection with the case, and that all the other witnesses were lying.  *Id*. at 616-17. The judge offered to bring Harrington in as a material witness, *id.* at 623, 624, and she also offered to question Harrington outside the presence of the jury, *id*. at 624-25, but the parties did not ask her to pursue either course of action.  The judge stated that she would not give a missing witness charge, *id*. at 627, and she warned the defense attorneys that they would not be allowed to comment on Harrington's absence, *id*. at 618-620.  If they did want to comment, the judge said she would allow the prosecutor to call her investigator to the stand to probe into the statements Harrington had made about her unwillingness to testify.  *Id*. at 618-20.  The judge also held that the prosecutor would be permitted to lead Heinrichs to testify that Harrington had been uncooperative and upset when he had last seen her.  *Id*. at 626-28.  Finally, the judge offered to give the jury a curative instruction to the effect that "[t]here is absolutely no evidence that these defendants are threatening or doing anything to anybody."  *Id*. at 629; *see also id*. at 630-32 (asking the defense attorneys what wording they would like for the instruction).

The judge acknowledged that the solution was not ideal, but that it was the best that could be done in the circumstances.  *Id*. at 622.

> I said to [the prosecutor] in the first instance, she should have
> cleared this up before she asked the question.  But now we are
> here.  I'm not having a mistrial on this issue.  Therefore, we are
> trying to solve the problem.

*Id*. at 622.  In accordance with her rulings during the conference, the judge resumed proceedings

before the jury with the following instruction:

> [I]t was inappropriate for this witness to use the word 'scared.'
> That is not an appropriate answer to the question.  I will also tell
> you as a matter of fact that there is no allegation that Ms.
> Harrington ever said that either of these defendants ever threatened
> her in any way, shape or form.

*Id*. at 632.  The prosecutor then resumed her questioning with two yes-or-no questions, eliciting

that Harrington had been both "very upset" and "uncooperative."  *Id*.

        c.     *The Attorneys' Treatment on Summation of the Evidence Suggesting*
              *Intimidation*

        Although Williams did not cite to the closing arguments in his direct

appeals or his habeas petition, both his own attorney and the prosecutor made reference to the

evidence of Watkins's unease in their summations.  The prosecutor also addressed the reasons

for Harrington's absence.  Speaking first, Williams's attorney argued:

> Khadija Watkins is the kind of person who told the police that
> night in the company of her friend [Thompson] has no enemies. . .
> . Later on she said she's scared to say anything in front of . . . her
> friend.  But you know, Khadija seems to have this real
> nervousness.  She's scared to say anything to the police officers
> when she's just there with her friend and nobody else. . . .Then she
> says at one point, remember she was testifying in the morning.
> She said she was asked, did you ever hear anything outside about
> 'yapping,' or threats?  And she said no.  Then after lunch, she got
> off the stand, the district attorney spoke to her, she came back and
> said, oh, yeah, I did hear a threat, but I didn't want to say it in the
> morning because somebody on the defense side made me nervous.
> Everything makes Khadija Watkins nervous."

*Id*. at 759-60.

        The prosecutor, too, addressed Watkins's "nervousness" in her summation.  She

stated that Watkins

didn't want anyone to know she was cooperating. That's why she said she told Detective Heinrichs that night that she didn't know who would want to hurt [Thompson]. Although she explained, that when I said I never actually heard them say they were going to hurt him, but really the reason I said that was because there was other people and my friend . . . was around. And in this building where I live, everyone knows everyone else's business. . . . And it is so sinister that someone wouldn't want other people to know that they are potentially going to cooperate with a murder investigation, especially when they knew who these people were?

*Id*. at 801-02. A little later in her summation, the prosecutor continued:

. . . I suggest when you watched [Watkins] on the witness stand, ladies and gentlemen, I think it's clear to say, or I suggest that you saw how uncomfortable she was. How in the middle of the initial question she almost just collapsed. She started speaking in one-word answers. Her demeanor changed and everything. And then, you know, we took a brief recess, and after lunchtime in the afternoon she came back and she told you. That's when she began her testimony. She lied when she said she had never been out on those benches that night, or at the apartment. Remember the explanation? She said is that while she was testifying in court that morning, that someone on the defense side was mouthing things at her and making gestures that made her nervous. I suggest when you heard her words and saw her, you know she clearly was scared. Keep in mind she was testifying in a murder trial. Again, two people who she grew up with, who knew everyone she knew. . . . And while she's testifying someone on the defendant's side said or did something to make her scared. And so her initial reluctance, what made her freeze is understandable in light of the situation that she found herself in. . . . I suggest, her fear as a result of this case, is just more evidence that everything that she told you was the truth.

*Id*. at 808-09. Williams's attorney made no objection during the course of these statements.

In her summation, the prosecutor also addressed Harrington's absence as a witness at trial:

[PROSECUTOR:]   . . . . One of the two girls [Watkins and Harrington] came into court and told you what she knew. There was no guarantee that either of them would come in here, so I suggest that we were lucky to get one.
[WILLIAMS' ATTORNEY:]   Objection.
THE COURT:   Overruled.

[PROSECUTOR:]　. . . . These girls possessed some pretty heavy
　　　information.　After the shooting –
[WILLIAMS' ATTORNEY:]　I'm going to object.　This is – the
　　　DA is testifying now.
THE COURT:　Overruled.
[PROSECUTOR:]　After the shooting, they put two and two
　　　together.　They had to make a tough choice.　Do they open
　　　their mouths and tell the police what they know?　Or do
　　　they keep quiet and do what is so easy?　Do they decide,
　　　sure, I'll tell the police.　Sure, I'll go into open court.　Sure,
　　　I'll face these two guys that I grew up with from my
　　　neighborhood.　We knew everybody.　I know, and point the
　　　finger and say, I heard them plan this robbery that
　　　happened that night.　Do I come into court with concern for
　　　myself with my long history with these two just like that?　I
　　　suggest, that it is not such an easy choice for anyone to
　　　make.　As you know, coming into court is not a simple
　　　process. . . . And I suggest as you look [at the video
　　　evidence], how disturbing that is, watching what this
　　　defendant and his partner are capable of.　And then they are
　　　asked to come in here to court and point the finger and say
　　　what they heard him say.　There are a million reasons why
　　　people, they don't come into court.　But I suggest, in light
　　　of everything you know in this case, there is nothing
　　　sinister or strange about that in this case.

*Id*. at 804-06.

2.　*Discussion*

A defendant is denied due process of law when the introduction of prejudicial

evidence "is so extremely unfair that its admission violates fundamental conceptions of justice."

*Dowling v. United States*, 493 U.S. 342, 352 (1990); *see also Dunnigan v. Keane*, 137 F.3d 117,

125 (2d Cir. 1998) (noting that erroneous admissions of evidence not rising to the level of

unfairness specified in *Dowling* are not grounds for habeas corpus relief).　As stated by the

Second Circuit, the standard for determining when such a violation has occurred is "whether the

erroneously admitted evidence, viewed objectively in light of the entire record before the jury,

was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that

would have existed on the record without it.  In short it must have been crucial, critical, highly

significant."  *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985) (internal quotation marks omitted).

On direct appeal, Williams asserted that this standard had been met.  He argued to

the Appellate Division that Watkins's "telling the jury she was nervous, and the court's letting

the jury know that 'something' was happening on the stand when she initially testified . . . was

bound to leave with the jurors the false impression that appellant had threatened her."  Brief for

Defendant-Appellant 29, Pet. Writ Habeas Corpus Ex. 2, June 29, 2010, ECF. No. 1.  Williams

argued that this impression was compounded by "the equally baseless suggestion that

[Williams's] putative threats to Quantella Harrington were so successful, she was too terrified to

appear as a witness."  *Id.*  Williams contended that, taken together, these suggestions of

intimidation deprived Williams of a fair trial, because they likely led the jury to conclude that

Williams was conscious of his guilt and therefore wanted to prevent witnesses from testifying

against him.  *Id.* at 29-30.  Given what Williams characterized as the unreliable testimony

provided by Watkins and the flimsy, circumstantial nature of the government's other evidence,

Williams asserted that "[t]he jury's hearing baseless, but highly prejudicial, suggestions of

threats to witnesses by [Williams] may have tipped the scales in favor of their convicting

appellant of the crime, despite their otherwise doubting his intent."  *Id.* at 30.

The Appellate Division rejected this argument and denied Williams's claim.  It

held that any error committed by the trial court in admitting the complained-of testimony "was

harmless, as there was overwhelming evidence of the defendant's guilt, and no significant

probability that the alleged error contributed to his conviction."  *Williams*, 873 N.Y.S.2d at 71.

In reaching this conclusion, the Appellate Division cited a New York Court of Appeals case,

*People v. Crimmins*, which incorporates the standard set out by the Supreme Court in *Champan*

*v. California* for determining whether a constitutional error was harmless: "namely, that there is no reasonable possibility that the error might have contributed to defendant's conviction and that it was thus harmless beyond a reasonable doubt." *People v. Crimmins*, 36 N.Y.2d 230, 237 (1975) (citing *Chapman v. California*, 386 U.S. 18 (1967)); *see also Perkins v. Herbert*, 596 F.3d 161, 172 n.7 (2d Cir. 2010) ("The Appellate Division used the harmless error standard of review from *Crimmins*, which incorporates the standard of review from *Chapman*.").

### a.  *Review of the State Court's Harmless Error Determination*

The Second Circuit has identified two different approaches for reviewing a state court's determination of harmless error and has declined to determine which of the two standards governs. *Perkins*, 596 F.3d at 175-76.  Under the first test, the habeas court determines whether the state court "acted reasonably in determining that the error was 'harmless beyond a reasonable doubt,'" in accordance with the standard for harmlessness set out by the Supreme Court in *Chapman v. California*. *Perkins*, 596 F.3d at 175 (quoting *Mitchell v. Esparza*, 540 U.S. 12, 17-19 (2003) (per curiam) (internal ellipses omitted)).  Under the second test, "a federal habeas court must assess, in its own judgment, whether the constitutional error resulted in 'actual prejudice' to the defendant." *Perkins*, 596 F.3d at 175 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-39) (1993)). According to the Second Circuit, it "has not yet been clearly established" which of these two standards applies "[w]here a state appellate court has found that a state trial court committed a constitutional violation but has held that the violation was harmless[.]"[6] *Perkins*, 596 F.3d at 175.

---

[6]  The Supreme Court appears to have explicitly held otherwise.  In *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007), the Supreme Court stated: "We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious' standard set forth in *Brecht*, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*." (citations omitted).  Accordingly, the Supreme Court seems to have decided that the second (and not the first) test identified by the Second Circuit in *Perkins*, 596 F.3d at 175, applies.  The *Brecht* standard was used by federal habeas courts to review the harmless error determinations of

*Reasonableness of the State Court's Application of the* Chapman
             *Standard*

In *Chapman*, the Supreme Court established that "[a] constitutional error is

harmless when 'it appears "beyond a reasonable doubt that the error complained of did not

contribute to the verdict obtained."''"  *Mitchell*, 540 U.S. at 17-18 (quoting *Neder v. United*

*States*, 527 U.S. 1, 15 (1999) (quoting *Chapman*, 386 U.S. at 24)). The Appellate Division's

determination that Williams suffered no harm from admission of the evidence at issue was not an

"objectively unreasonable" application of this standard.  *See Mitchell*, 540 U.S. 12, 18

("[H]abeas relief is appropriate only if the [state appellate court] applied harmless-error review

in an 'objectively unreasonable' manner" (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-77

(2003)).

The jury's verdict was well-supported by the evidence, leaving aside the alleged

intimations of intimidation.   Substantial evidence including video footage and photographs and

Williams's statement to the police, placed Williams at the scene of the homicide.  There was

ample evidence of Williams's intent to commit a felony, including Watkins's testimony about

the plan to "yap" Thompson and Wise's testimony about the pawning of the victim's chain.

Further, the record supports a determination that the jury was not "substantially swayed by the

error," *Kotteakos v. United States*, 328 U.S. 750 (1946).  The challenged evidence constituted a

minor part of the case presented to the jury – a single statement by Watkins that she was

state courts prior to the enactment of AEDPA.  *See Brecht*, 507 U.S. at 638 (holding that the articulated harmless
error standard "applies in determining whether habeas relief must be granted because of constitutional error of the
trial type").  As the *Fry* court notes, "AEDPA limited rather than expanded the availability of habeas relief," and it is
therefore "implausible that, without saying so, AEDPA replaced the *Brecht* standard of 'actual prejudice' with the
more liberal AEDPA/*Chapman* standard . . . ." (citations and internal quotation marks omitted).

In *Perkins*, the Second Circuit found that habeas relief would be unavailable to the petitioner
under either the AEDPA/*Chapman* or the *Fry*/*Brecht* test.  The court therefore found it unnecessary to acknowledge
the Supreme Court's apparently decisive determination that the latter test applies in all federal habeas proceedings in
which state court harmless error determinations are reviewed.  *See Perkins*, 596 F.3d at 176 (addressing *Fry* with a
single "but see" citation).  As discussed below, as in *Perkins*, Williams's claim fails under either standard.

"nervous" because "[s]omeone that was sitting on the defense side was saying something to me from over there," Trial Tr. at 206-07; a statement by Heinrichs that Harrington was "very upset and scared" and that she "didn't want to be there" and "said that she couldn't testify," *id*. at 614-15; and a second statement by Heinrichs that Harrington was "very upset," *id*. at 632. In addition, the trial court gave a curative instruction, telling the jury to disregard Heinrichs's statement that Harrington had been "scared" and reminding the jury there was no evidence that either defendant had threatened Harrington. *Id*. at 632

In her closing, the prosecutor commented at length on the challenged evidence, but Williams does not rely on these comments to support his petition; they are nowhere mentioned in the Appellate Division briefs attached to his petition. Arguably, because the prosecutor's comments were not presented to the state court on direct appeal as a basis for Williams's due process claim, any claim attempting to rely on the comments as a basis for habeas relief would be unexhausted. [7] But the state court's finding of harmlessness is not

---

[7]       This would be true if Williams's due process claim, as presented in the state courts, would be "fundamentally altered" by consideration of the prosecutor's closing statements. *See Vasquez v. Hillery*, 474 U.S. 254, 260 (1986) (a claim is unexhausted where supplemental evidence presented to the habeas court "fundamentally alter[s] the legal claim already considered by the state court"); *Rodriguez v. Hoke*, 928 F.2d 534, 537 (2d Cir. 1991) (petitioner's claim of ineffective assistance of counsel was not exhausted where it was based on six factual allegations, only two of which had been raised in state court). Alternately, the claim might be partially unexhausted, preventing me from considering any evidence not presented in the state courts in support of the claim. *Cf. Bonilla v. Portuondo*, 00-CV-2369(JGK)(JCF), 2004 WL 350694, at *4 (S.D.N.Y. Feb. 26, 2004) (considering and denying argument that claim was partially unexhausted, where fact supporting habeas petition not presented to state courts was "merely one additional  factor to be considered" that did not fundamentally alter petitioner's legal claim), *report and recommendation adopted by* 2004 WL 1782174 (S.D.N.Y. Aug. 9, 2004).

      Second Circuit case law suggests that Williams's due process claim might be fundamentally altered by consideration of the prosecutor's statements. His claim depends on the overall impact of the contested evidence on the jury's verdict. *See Collins*, 755 F.2d at 19 (erroneous admission of prejudicial evidence constitutes due process violation only if it was sufficiently material in light of entire record to provide basis for different verdict); *see also Mitchell*, 540 U.S. at 17-18 (constitutional error is harmless if "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" (internal quotation marks omitted)). This impact could turn on the cumulative effect of the evidence along with the attorneys' references to it, such that the claim might become essentially a different claim when the closing statements are considered. *See Rodriguez*, 928 F.2d at 538 (finding petitioner's ineffective assistance claim unexhausted where, of six factual bases presented in federal court, only two were raised in the state courts, because an ineffective assistance claim "can turn on the cumulative effect of all of counsel's action [and so] all . . . allegations of ineffective assistance should be reviewed together"). *But see Miller v. Estelle*, 677 F.2d 1080, 1083-84 (5th Cir. 1982) (claim concerning improper jury

36

unreasonable even taking into account the prosecutor's statements. The prosecutor observed that

Watkins and Harrington were "uncomfortable" and "scared" to testify, but she did not say that

Williams was responsible for their fear, or that the women's unease should bear in any way on

the jury's deliberation of Williams's guilt.[8]  Instead, the prosecutor relied on the challenged

testimony in an effort to rehabilitate Watkins's credibility and to explain Harrington's failure to

appear, and she did so in response to defense counsel's own statements disparaging Watkins's

credibility and constitution.  The prosecutor did not imply that Williams ever threatened either

woman.  A reasonable reading of her statements suggests that the women did not fear Williams

personally, but were intimidated by the "sinister" nature of the community in general, as well as

the dangers of testifying against someone who was an integral part of that community and "knew

everyone [they] knew."  Trial Tr. at 801-02, 808-09.

    Accordingly, the Appellate Division's determination as to the harmlessness of any

constitutional error committed in connection with the admission of the contested evidence was

reasonable in light of *Chapman*.[9]

---

contacts "was squarely raised" in the state courts where the habeas petition included alleged incidents of improper
jury contacts not presented to the state courts, because "the incidents left out differed only in number, not in kind,
from the one which formed the basis for [petitioner's] federal claim," and the "surplusage was simply not crucial to
the claim which was already before the state court"); *Bonilla*, 2004 WL 350694, at *4 ("one additional fact" calling
eyewitness's credibility into question need not have been presented in the state courts to exhaust petitioner's
sufficiency of the evidence claim).

    I need not decide whether consideration of the prosecutor's statements would "fundamentally
alter" the nature of Williams's due process claim because Williams has not relied on the those statements in his
arguments before this Court, and, as discussed below in the text, consideration of the statements would not affect my
disposition of Williams's petition.

   [8]   Indeed, she urged the jury not to concentrate on Harrison's absence or Watkins's changed
testimony, stating that there was "nothing for [the jury] to consider from [Harrison] at all, and suggesting that they
"focus on what [Watkins] told you."  Trial Tr. at 807.

   [9]   In coming to its determination, the Appellate Division did not cite *Chapman*, and it articulated a
test that differs from the *Chapman* test.  The Appellate Division found no harm because there was no "*significant*
probability that the alleged error contributed to [the] conviction," *Williams*, 873 N.Y.S.2d at 71 (emphasis added),
whereas *Chapman* instructs courts to find no harm where there is "no *reasonable* possibility that the evidence
complained of might have contributed to the conviction," *Chapman*, 386 U.S. at 24.  Under Second Circuit law, the
job of a federal habeas court is to determine "the reasonableness of the state courts' 'decision,' not [to] grad[e] their
papers."  *Cruz v. Miller*, 255 F3d 77, 86.  Accordingly, a state court's misstatement of the governing legal principle
is irrelevant, as long as its conclusion is not unreasonable under the correct standard.  *See id.*

  ii.  *Assessment of Actual Prejudice*

  Under the second test identified by the Second Circuit for evaluating a state court's finding of harmlessness, the inquiry is whether admission of the evidence complained of "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (internal quotation marks omitted); *see also Perkins*, 596 F.3d at 175. This test is "more forgiving" to Respondent than the test based on *Chapman*. *Fry*, 551 U.S. at 116. Accordingly, it follows from the foregoing discussion that I conclude Williams has not satisfied the *Brecht* standard here. As discussed above, the evidence at issue constituted a minor portion of the trial transcript – three brief exchanges in over nine-hundred pages of transcript.[10] *See Brecht*, 507 U.S. at 639 ("The State's [improper statements at trial] were infrequent, comprising less than two pages of the 900-page trial transcript in this case."). Furthermore, the judge told the jury to disregard a portion of one exchange. *See* Trial Tr. at 632.

  No one testified that Williams had threatened Harrington or Watkins, the prosecutor never told the jury that he had, and the judge explicitly instructed the jury that there had been "no allegation that Ms. Harrington ever said that either of these defendants ever threatened her in any way, shape or form," Trial Tr. at 632. Moreover, as discussed above, "the State's evidence of guilt was, if not overwhelming, certainly weighty," *Brecht* at 639. For these reasons, I find that the testimony pertaining to Watkins's and Harrington's discomfort at the prospect of testifying did not "substantially influence" the jury's verdict, see *id*. at 623, and accordingly, did not "result[] in 'actual prejudice' to the defendant," *Perkins*, 596 F.3d at 175.

---

[10]  Even if the prosecutor's statements are considered, the challenged suggestions of intimidation constituted a minor part of the trial. The prosecutor's comments about Watkins's and Harrington's reluctance to testify cover less than five transcript pages in a closing statement over thirty-five pages long.

b.      *Due Process Implications of the Challenged Testimony*

More fundamentally, Williams's due process rights were not violated by admission of the challenged testimony.  The erroneous introduction of prejudicial evidence does not violate due process unless it "is so extremely unfair that its admission violates fundamental concepts of justice."  *Dowling v. United States*. 493 U.S. 342, 352 (1990).  The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly."  *Id.* at 352.  Where unfairly prejudicial evidence is not "probative of an essential element" in the case but is nonetheless admitted at trial, the error is not of constitutional magnitude unless its introduction is "'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'"  *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992)).  The materiality of the prejudicial evidence is assessed in light of the entire record before the jury. *Dunnigan*, 137 F.3d at 125.

As previously discussed, the testimony about Watkins's and Harrington's reluctance to testify constituted a minor portion of the record and the judge twice gave the jury curative instructions, directing them to disregard testimony that Harrington had been "scared," and noting there was no evidence that Harrington had been in any way threatened by Williams, Trial Tr. at 632.  The jury knew that Thompson, Williams, Leshawn, Watkins, and Harrington had all grown up together, and that they had many mutual friends who were part of the same community where they all continued to gather socially.  The jury also knew that Thompson had been shot and killed in the same community.  The sensitive and "sinister" nature of the situation, as the prosecutor phrased it, was therefore evident to the jury even without introduction of the contested testimony.  The statements about Watkins's and Harrington's discomfort confirmed

what the jury most likely already understood – that, whether or not Williams was involved in Thompson's homicide, testifying against him could be at best an uncomfortable, and at worst a frightening, prospect. In this context, testimony about the women's reluctance to testify did not provide the jury with a basis for finding Williams guilty, and it did not undermine his defense – that he had shown no intent to rob Thompson, and that he fled from Thompson and Leshawn before Thompson was shot.

In *Dunningan v. Keane*, the Second Circuit considered the habeas petition of a claimant who had been convicted in state court of robbery and related offenses. 137 F.3d at 120. The trial court had admitted testimony from which an inference could be drawn that the defendant was a violent convicted felon. *Id*. at 121-22, 126. Two of the three objected-to statements were not probative of any element at issue, the judge gave no limiting instruction although an instruction was "plainly warranted," and the prosecutor commented on the prejudicial testimony in his closing. *Id*. at 126-27. The Second Circuit nevertheless found no due process violation because the testimony made up a very small part of the trial transcript and there was compelling evidence of guilt, such that disclosure of facts indicating the petitioner was a violent felon could not have been a "material basis" for the conviction. *Id*.

Similarly, the statements that Williams claims suggested he had intimidated a witness and a potential witness, were not "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it," *id*. at 125 (internal quotation marks omitted). Particularly in light of the judge's instructions to the jury that Williams had not intimidated Harrington, the introduction of the challenged testimony cannot be said to fall in that "very narrowly" defined "category of infractions that violate 'fundamental fairness.'" *Dowling*, 493 U.S. at 352.

D.    *Exclusion of Children from the Courtroom*

Prior to the start of trial, the trial judge ruled that small children would not be permitted in the courtroom during the course of trial:

> THE COURT:    I have indicated on the record  --- off the record and yesterday off the record as well, I am not permitting small children in the courtroom.  The defendant had some people in, a child in yesterday --- two children, actually, and I had them leave the room.  I have the same instruction as to the two young children who are sitting in the courtroom at this time.  Children do not belong in a courtroom.
> [PROSECUTOR:]    I have spoken to them, and they momentarily are going to sit outside not to be back in the courtroom for the remainder of the trial.
> THE COURT:    I want that to happen before the jury comes in.
> [PROSECUTOR:]    That's what I told them.

Voir Dire Tr. at 489-90.  Neither Williams's nor Leshawn's attorney objected to the order at that time.

Williams claims that this order violated his constitutional right to a public trial. Respondent argues that this claim is procedurally barred from federal habeas review both because Williams failed to exhaust the claim in state court and because the Appellate Division rejected the claim on an adequate and independent procedural ground.  He also contends that the claim fails on the merits.  I find that Williams did exhaust the public trial claim, but that it is nonetheless procedurally barred, as it was decided in state court on an adequate an independent procedural ground.

1.    *Exhaustion of the Public Trial Claim*

A federal court may not consider an application for a writ of habeas corpus on the basis of a constitutional violation unless the petitioner has exhausted state remedies for the alleged violation.  28 U.S.C. § 2254(b)(1)(A).  This exhaustion requirement "is not satisfied

unless the federal claim has been 'fairly presented' to the state courts." *Daye v. Attorney General of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*).  Williams presented his public trial claim in the *pro se* supplemental brief he submitted to the Appellate Division. Williams Supp. Br. ("Supp. Br."), 2-5, Pet. Writ Habeas Corpus Ex. 2, June 29, 2010, ECF. No. 1.  However, unless Williams sought leave to appeal this particular claim to the Court of Appeals after it was rejected in the Appellate Division, the exhaustion requirement of 28 U.S.C. § 2254 is not satisfied.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Jones v. Keane*, 329 F.3d 290, 295 (2d Cir. 2003).  The record demonstrates that Williams fairly presented his public trial claim to the Court of Appeals in connection with his application for leave to appeal.

After the Appellate Division rejected all four of Williams's constitutional claims, including his public trial claim, *Williams*, 873 N.Y.S.2d 71, his counsel submitted a letter to the Court of Appeals, dated December 10, 2008, seeking leave to appeal the Appellate Division's decision.  Application Leave Appeal, Dec. 10, 2008, Resp. Mem. Ex. G, ECF. No. 5 Attachment 1.  The letter states, in relevant part:

> I am enclosing copies of the briefs filed in the Appellate Division along with the court's decision and order.  We request this court to review all issues raised in the Appellate Division briefs, namely:
>
> POINT I
> APPELLANT WAS DENIED HIS RIGHT TO A JURY TRIAL, TO PRESENT A DEFENSE, AND TO DUE PROCESS OF LAW BY THE TRIAL COURT'S REFUSAL TO SUBMIT FOR THE JURYS CONSIDERATION THE 'NON-SLAYER' AFFIRMATIVE DEFENSE TO FELONY MURDER.  U.S. CONST., AMENDS VI, XIV; N.Y. CONST. ART. I, §6.
>
> POINT II
> APPELLANT WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL BY THE REPEATED, BUT BASELESS, HINTS AND SUGGESTIONS

OF THREATS AND INTIMIDATION BY
APPELLANT AND CO-DEFENDANT TO A
PROSECUTION WITNESS AND TO A
POTENTIAL WITNESS.  U.S. CONST., AMEND
XIV; N.Y. CONST., ART. I, §6.

*Id*.  Whether this letter "fairly presented" the public trial claim to the Court of Appeals is

unclear.[11]  The sentence requesting the Court of Appeals to consider "*all* issues" raised in the

*briefs* filed in the Appellate Division," but then specifically naming only those issues raised in

the counseled brief, is ambiguous.[12]  However, further correspondence between the Court of

Appeals and Williams's counsel, and between the Court of Appeals and Williams, leave no

doubt that the claims raised in Williams's *pro se* brief to the Appellate Division were fairly

presented to the Court of Appeals.

Following receipt of counsel's December 10, 2008 letter, the Court of Appeals

responded with a letter on December 18, 2008, which stated: "To complete the application,

---

[11]     The letter does not specify whether the enclosed "briefs filed in the Appellate Division" included
Williams's *pro se* brief.  If not, this letter would not have sufficed to fairly present the public trial claim to the Court
of Appeals, as that claim would have been nowhere referenced in the application for leave to appeal or its
attachments.  *See Baldwin v. Reese*, 541 U.S. 27, 32 (2004) (claim not fairly presented where appellate court must
read beyond the papers presented to it to find the claim); *cf. Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) (claims
other than those specifically mentioned in letter seeking leave to appeal not fairly presented where "[t]he only
possible indication that [they] were being presented was the inclusion of a lengthy brief originally submitted to
another court").  If the "briefs" referenced in counsel's letter included Williams's *pro se* brief, the wording of the
letter places the application in a gray area between applications for leave to appeal that, according to the Second
Circuit, fairly present a federal question to the Court of Appeals and those that do not.  *Compare Morgan v. Bennett*,
204 F.3d 360 (2d Cir. 2000) (claim exhausted where counsel's letter attached Appellate Division *pro se* and
counseled briefs and stated review was sought on "all issues outlined in defendant-appellant's brief and *pro se*
supplemental brief," but subsequent letter identified a single "question presented" to the exclusion of other claims
asserted in Appellate Division briefs), *cert. denied*, 531 U.S. 819 (2000), *with Jordan v. Lefevre*, 206 F.3d 196 (2d
Cir. 2000) (claims included in Appellate Division brief were not exhausted where brief was attached to application
letter but letter "forcefully argued [one] claim in the first three paragraphs of the application for leave, but made no
reference to the" claims found to be unexhausted).

[12]     Respondent suggests that this sentence should be read to present only the specifically identified
claims, and not "all claims" raised in both briefs.  In support of this argument, Respondent notes that the state's
"letter in opposition for leave to appeal did not address the claims in the *pro se* supplemental brief."  Resp. Mem. 4
n.3, Sept. 27, 2010, ECF No. 5.  Respondent argues that the state's failure to address Williams's *pro se* claims
indicated that it "understood defendant's leave application as not raising the two claims in the *pro se* supplemental
brief."  *Id*.  The state's failure to address the claims in Williams's *pro se* brief suggests that the state may have
seized upon an opportunity either to resolve the ambiguity in its favor or to distract the Court of Appeals' attention
from the ambiguous nature of the application.  The possibly self-serving presentation of the state's letter in
opposition does not in any way alter the ambiguous nature of the request made by Williams's counsel, or inform this
court as to how to determine the scope of that request**.**

please forward a copy of the *pro se* supplemental brief." Ct. App. Letter Re. Supp. Br., Dec. 18, 2008, ECF. No. 11. A letter dated January 6, 2009, which apologized for inadvertently omitting the *pro se* brief from the original application, indicates that counsel complied with the Court of Appeals' request. Def. Counsel Letter Re. Supp. Br., Jan. 6, 2009, ECF No. 11. The court's specific request for the *pro se* brief confirms that it understood Williams's application for leave to appeal to encompass all four claims raised in the Appellate Division, including the two claims raised in Williams's *pro se* brief, and it further indicates that the Court of Appeals not only had a fair opportunity to consider those claims but in fact considered them.

Moreover, on May 7, 2009, the Court of Appeals received a letter from Williams asking it to reconsider his application for leave to appeal. Def. Letter Re. Recons., May 7, 2009, ECF No. 13. In this letter, Williams specifically mentioned two of his four claims, namely the due process claim based on the suggestions of witness intimidation, and the public trial claim. *Id.* The Court of Appeals responded by letter dated June 3, 2009, informing Williams that the court had given "full consideration to your original application and to your request for reconsideration." *Id.* The Court of Appeals therefore explicitly acknowledged that it had fully considered the public trial claim included in Williams's request for reconsideration.

Accordingly, I conclude that Williams's public trial claim was not only "fairly presented" to the Court of Appeals but was fully considered by that court. The claim has therefore been exhausted within the meaning of 28 U.S.C. § 2254(b)(1)(A) and (c).

    2.    *Procedural Default of the Public Trial Claim*

Although Williams's public trial claim has been exhausted, this court may not entertain the claim as the basis for habeas relief because it has been procedurally defaulted. A claim raised in a federal habeas petition is procedurally defaulted where it has been dismissed in

44

the state courts due to a procedural bar preventing adjudication on the merits.  *Harris*, 489 U.S. at 260-62.  The Appellate Division held that Williams's public trial claim was "unpreserved for appellate review and, in any event, [was] without merit."  *Williams*, 873 N.Y.S.2d at 71.  The trial record reveals no objection by Williams's counsel to the court's order excluding children from the courtroom.  Under New York law, an objection to "a ruling or instruction of a criminal court during a trial" is not preserved unless "a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same."  N.Y. Criminal Procedure Law § 470.05(2).

At oral argument before this Court, Williams suggested that his trial counsel had made an off-the-record objection to the order excluding children.[13]  However, New York law suggests that, in order to be preserved for appellate review, an objection to an order at trial must be preserved on the record.[14]  *See People v. Figueroa*, 629 N.Y.S.2d 260, 261 (2d Dep't 1995)

---

[13]    At oral argument, I observed that there had been "some stuff off the record with regard to closing the courtroom to children."  Dec. 1, 2010 Oral Arg. Tr. 8.  I also noted that the record did not contain an objection to the judge's order closing the courtroom.  Williams responded: "[A]s you pointed out, there is some omissions from the record.  It's my belief and understanding, at that time that the objection was made.  Due to the fact that there were omissions on the record that we are unable to recover it short of an evidentiary hearing."  *Id*. at 9.

[14]    In *People v. Ortiz*, for example, the Appellate Division, First Department, held that "defendant's claim that he was improperly precluded from impeaching [a witness] with [a certain aspect of] his Grand Jury testimony . . . was not adequately preserved" where trial counsel made a request on the record to use a different portion of the grand jury testimony.  672 N.Y.S.2d 327, 329-30, *leave denied*, 92 N.Y.2d 881 (1998).

> The prosecutor objected [to defense counsel's request] and an off-the-record discussion ensued.  It cannot be inferred from the unknown contents of that discussion, or from the subsequent questions propounded by defense counsel, that the defense specifically argued that he was improperly foreclosed from cross-examining [the witness] as to that portion of his Grand Jury testimony [that defendant identified on appeal].

*Ortiz*, 672 N.Y.S.2d at 329-30.  Similarly, in *People v. Travison*, the Appellate Division, Third Department, considered an appellant's claim that he had been denied a fair trial where the prosecutor cross-examined him as to prior bad acts.  400 N.Y.S.2d 188 (3d Dep't 1977), *aff'd*, 46 N.Y.2d 758 (1978), *cert. denied*, 441 U.S. 949 (1979).  Because his trial attorney had moved to suppress one prior bad act before the start of trial, the Appellate Division held the defendant could not complain on appeal of being questioned as to other prior bad acts, "particularly since he did not object to their use at trial."  *Travison*, 400 N.Y.S.2d at 191.  The Appellate Division's holding was not

(claim "was not preserved for appellate review, as the defendant failed to place an objection *on the record* at the time of trial") (emphasis added), *appeal denied*, 88 N.Y.2d 847 (1996). In any event, Williams did not represent to the Appellate Division that his trial counsel had made an off-the-record objection to the exclusion order. Dec. 1, 2010 Oral Arg. Tr. 9. If such an objection was made, it was "clearly outside of the trial record," *Caballero v. Keane*, 42 F.3d 738 (2d Cir. 1994), and Williams made "no effort . . . to bring [it] to the attention of the state court," *United States ex rel. Brodie v. Herold*, 349 F.2d 372, 371 n.1 (2d Cir. 1965). It therefore does not enter into my review of the Appellate Division's decision barring the claim on procedural grounds.[15]

Because the Appellate Division explicitly relied on a procedural bar as an independent basis for its disposition of Williams's public trial claim, that claim is not subject to federal habeas review, *see Harris*, 489 U.S. at 263; *Galarza v. Keane*, 25 F.3d 630, 637 (2d Cir. 2001), even though the court also addressed the merits of Williams's public trial claim in an alternative holding, *see Harris*, 489 U.S. at 264 n.10; *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 810 n.4 (2d Cir. 2000). This case presents none of the three circumstances in which a federal claim that has been procedurally defaulted will be reviewable in a federal habeas court.

First, Williams's claim would be reviewable despite the procedural default if he could show both "cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750. A petitioner may establish cause by showing "'that the

_____

altered by the fact that, as one justice observed in dissent, "proceedings at the bar were never placed on the record," *id*. at 192-93 (Mikoll, J., dissenting), and may have contained objections to the prosecutor's line of questioning.

[15] Williams might have brought a claim for ineffective assistance of trial counsel for failing to object to the court's ruling on the record. Such a claim might have succeeded, particularly in light of New York case law strongly suggesting that the manner in which the trial court excluded Williams's children and, by extension, his parents, was improper. *See, e.g., People v. Garcia*, 710 N.Y.S.2d 345 (1st Dep't 2000); *People v. Stanton*, 495 N.Y.S.2d 998 (1st Dep't 1985). However, Williams has not raised ineffective assistance of trial counsel as a basis for habeas relief. Even if he had, such a claim could not considered by this court, as it has not been exhausted in the state courts. *See Jackson*, 404 F.3d at 618 (for exhaustion to occur, a petitioner must present the "substance" of his claim to the state courts in such a way as to call to mind a particular constitutional right).

factual or legal basis for a claim was not reasonably available to counsel or that some interference by officials made compliance impracticable.'" *Id*. at 753 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (internal quotation marks and ellipses omitted)).  Williams has not made this showing.  Second, Williams has not asserted that "he is actually innocent," *Dunham*, 313 F.3d at 730, of felony murder.  Finally, this case is not among the "exceptional cases," *Lee*, 534 U.S. at 376, in which the state procedural ground is inadequate to bar consideration of a federal question.

In assessing the adequacy of a state procedural ground, habeas courts look to three "guideposts," *Cotto*, 331 F.3d at 240.  The first of those guideposts – what role the procedural violation played in the trial court's decision, *id*. – "is not very relevant in cases . . . reviewing application of the 'contemporaneous objection' rule," because "the lack of objection by a party would not, almost by definition, be mentioned by the trial court." *Monroe v. Kuhlman*, 433 F.3d 236, 242 (2d Cir. 2006).  The second guidepost – "whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented," Cotto, 331 F.3d at 240 – weighs against allowing review of Williams's defaulted claim.  The New York Court of Appeals has held that the contemporaneous objection rule "require[s], at the very least, that *any matter* which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the problem and thereby avert reversible error." *People v. Luperon*, 85 N.Y.2d 71, 78 (1995) (emphasis added);  *see also Garcia v. Lewis*, 188 F.3d 71, 80-81 (2d Cir. 1999) (where a trial court ordered the exclusion of certain individuals from the courtroom, and "the merits of excluding . . . individuals . . .was neither raised nor otherwise discussed in a meaningful way,"

the Appellate Division's determination that the defendant "failed to preserve his claim has a 'fair and substantial' basis in state law").

Finally, the third guidepost calls for consideration of whether Williams "substantially complied" with the procedural rule "given the 'realities of trial,' and, therefore whether demanding perfect compliance with the rule would serve a legitimate governmental interest." *Cotto*, 331 F.3d at 240. Williams's counsel placed no objection on the record to the trial court's order excluding children from the courtroom, which suggests that he gave the trial court no opportunity to consider any objections Williams might have to its order. In these circumstances, New York had a strong governmental interest in enforcing its contemporaneous objection rule, particularly where violation of a defendant's public trial right is not subject to harmless error analysis. *See Waller v. Georgia*, 467 U.S. 39, 49-50 (1984) (the defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee).

Accordingly, Williams's public trial claim has been procedurally defaulted, and it cannot serve as a basis for federal habeas relief.

E.      *Admission of Williams's Statement to the Police*

The final basis asserted by Williams in his petition for federal habeas relief concerns the statement he made to police on June 30, 2003. Williams argues that the statement should have been suppressed both because it stemmed from an illegal arrest, and because it was not made voluntarily. Accordingly, Williams claims that failure to suppress the statement implicated his Fourth and Fifth Amendment rights.

1.      *Exhaustion of Williams's Claims Concerning His Statement to the Police*

The state contends that Williams failed to exhaust his constitutional claims based on the admission of his statement to the police.  There is no question that Williams presented his claims to the Appellate Division.  His *pro se* supplemental brief to the Appellate Division argued that "[t]he people failed to establish the voluntariness of Williams [sic] statement while he was illegally in police custody," and that the statement's admission was therefore in violation of his Fourth, Fifth, and Fourteenth Amendment rights.  Supp. Br. 6-8.  Respondent argues that Williams did not present this question to the Court of Appeals in his application for leave to appeal.  Again, the state points to the ambiguous letter dated December 10, 2008 that was sent from Williams's counsel to the Court of Appeals.  For the reasons stated above in Section D.1, the ambiguity contained in this letter was resolved in Williams's favor by the letters dated December 18, 2008 and January 6, 2009 exchanged between the Court of Appeals and Williams's attorney.   The correspondence establishes that Williams's constitutional claims concerning admission of his statement to the police were fairly presented to the Court of Appeals.  Accordingly, the claims are exhausted.

2.      *Alleged Fourth Amendment Violation*

Williams asserts that he was arrested on June 30, 2003 without probable cause, and that the statement he made to Detectives Kenny and Heinrichs while he was in custody following the arrest should have been suppressed pursuant to *Wong Sun v. United States*, 371 U.S. 471 (1963), and *Brown v. Illinois*, 422 U.S. 590 (1975).  In *Wong Sun* and *Brown*, the Supreme Court addressed the circumstances in which the Fourth Amendment mandates exclusion of a defendant's statement procured after an illegal arrest.  *See Brown*, 422 U.S. at 602 ("*Wong Sun* . . . mandates consideration of a statement's admissibility in light of the distinct

policies and interests of the Fourth Amendment."); *see also Oregon v. Elstad*, 470 U.S. 298, 306 (1985) ("The *Wong Sun* doctrine applies as well when the fruit of the Fourth Amendment violation is a confession."). Williams's Fourth Amendment claim cannot serve as the basis for federal habeas relief.

"[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 481-82 (1976). In the Second Circuit, "review of fourth amendment claims in habeas petitions [will] be undertaken in only one of two instances: (a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992). As noted by the Second Circuit, "the federal courts have approved New York's procedure for litigating Fourth Amendment Claims, embodied in N.Y.Crim.Proc.Law § 710.10 *et seq.*, as being fully adequate," *id.* at 70 n.1 (internal quotation marks and citation omitted). Williams has not argued that he was precluded from using the mechanisms established in Article 710 to redress his Fourth Amendment claim. Nor has Williams argued that there was an "unconscionable breakdown" in process that prevented him from seeking redress for any potential Fourth Amendment violation.

Prior to the start of trial, a hearing was conducted to determine whether Williams's statement to the police should be suppressed. Two witnesses testified: Detectives Heinrichs and Kenny, the police officers who arrested and questioned Williams on June 30,

2003. These were the same witnesses who testified to Williams's statement at trial. At the suppression hearing, the witnesses provided full details of Williams's arrest and the conditions under which he was held at the precinct and questioned. Both witnesses were examined by Williams's attorney. Following the hearing, Justice Abraham Gerges denied Williams's motion to suppress the statement. Decision Denying Mot. Suppress. On appeal, the Appellate Division considered Williams's Fourth Amendment claim and found the claim to be "without merit" based on the record developed in the court below. *Williams*, 873 N.Y.S.2d at 71. While Williams may disagree with the results of the state's "corrective mechanism" as it operated to address the alleged Fourth Amendment violation in his case, he was not precluded from using that mechanism. *See Capellan*, 975 F.2d at 71 ("Even if [petitioner] were correct in his allegation that the Appellate Division erroneously decided this issue, a petitioner cannot gain federal review of a fourth amendment claim simply because the federal court may have reached a different result.").

Even if Williams's Fourth Amendment claim could properly be considered, it would fail. The detectives who arrested Williams on June 30, 2003 had probable cause to do so. On the morning of June 28, 2003, Kenny and Heinrichs met with Harrington and Watkins. *Huntley* Trans. at 4, 39, 110.[16] Although they were interviewed separately, both witnesses provided the detectives with the same names of two individuals they believed to be responsible for Thompson's death: "Dee" and "Shawn" Williams. *Id*. at 4-5. Harrington and Watkins said the two individuals were cousins, and both knew the cousins personally. *Id*. at 5-7. The detectives showed each witness a VIPER photograph taken from the elevator of 2946 West 23rd Street around the time of the shooting. *Id*. at 6-7. Both Harrington and Watkins told the

---

[16]     During the initial phase of the hearing, Harrington and Watkins were referred to, respectively, as "Witness Number One" and "Witness Number Two." The identities of the witnesses were revealed at a later stage of the hearing. *Id*. at 93.

detectives they recognized Dee in the photograph, and both identified the same individual as Dee. *Id*. at 7-8. Following these interviews, Williams and Leshawn became the focus of the officers' investigation. *Id*. at 10. The detectives began to look for the cousins two days later, on June 30, 2003. *Id*. Williams was located and arrested right away, in the late afternoon of June 30, near the corner of West 30th Street and Mermaid Avenue.[17] *Id*. at 10-11, 26.

Probable cause to arrest "exists when police officers have 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). Information supplied by an informant may serve as the basis for probable cause as long as it is "sufficiently reliable." *See United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993). An informant's reliability is assessed by a totality-of-the-circumstances analysis that takes into account factors such as the informant's veracity or reliability and her basis of knowledge. *Illinois v. Gates*, 462 U.S. 213, 232-33, 238 (1983). Information may also be deemed sufficiently reliable to establish probable cause "if it is corroborated in material respects by independent evidence." *Wagner*, 989 F.2d at 72-73.

In the case of Williams's arrest, probable cause to suspect that he had committed a crime was established by consistent information independently provided by at least two witnesses[18] who knew Williams, Leshawn and Thompson well, and who both named Williams as one of Thompson's likely assailants. This information was corroborated by the VIPER

---

[17] At trial, Heinrichs testified to having arrested Williams near West 24th Street and Surf Avenue. *Id*. at 554. The two locations are approximately six blocks apart.

[18] On June 28, 2003, the same day that Watkins and Harrington were interviewed, Kenny also took part in the interview of a third witness, Danielle Jones. *Huntley* Tr. at 8-9, 56-60, 96. Kenny did not testify at the *Huntley* hearing about the content of Jones's statements at that time, but he did testify that in an interview conducted several weeks later, on September 3, 2003, Jones also named "Dee" and "Shawn" Williams in connection with the homicide. *Id*. at 9-10.

photograph, which placed Williams at the scene of the homicide just before it occurred. The "reasonably trustworthy information" provided by Watkins and Harrington, along with the VIPER photograph, was enough "to warrant a man of reasonable caution in the belief that an offense [had] been . . . committed by [Williams,] the person to be arrested."[19] *United States v. Ceballos*, 654 F.2d 177, 184-85 (quoting *Dunaway*, 442 U.S. at 208 n.9 (internal quotation marks and citations omitted)). Accordingly, even if Williams's Fourth Amendment claim could be considered by this Court as a basis for habeas relief, the claim would be denied.

3.      *Alleged Fifth Amendment Violation*

Williams also claims that his statement was involuntary and therefore should have been suppressed to protect his Fifth Amendment rights. Williams's confession should have been suppressed if it was involuntary or if it was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). "These two claims are interrelated, but analytically distinct." *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir. 1998).

a.      *The Claim that Williams's Statement Was Involuntary*

A statement is involuntary and inadmissible under the Fifth Amendment if it was obtained by 'techniques and methods offensive to due process,' or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'" *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (quoting *Haynes v. Washington*, 373 U.S. 503, 515, 514

---

[19]      Following the interview, Kenny asked the D.A. for authorization to continue with Williams's arrest processing, but authorization was denied on the ground that there was no basis for an arrest. *Huntley* Tr. at 16-17. The D.A. instructed Kenny to locate the witnesses who had been interviewed on June 28, which he was unable to do. *Id*. at 17. Accordingly, he released Williams that night. *Id*. The D.A.'s determination, made after the interview, that there was no basis for arresting Williams does not affect this Court's determination that probable cause existed to arrest Williams prior to the interview. Evidence on the record suggests that the D.A.'s determination was based on internal policies having to do with who must conduct an interview before an arrestee is processed and detained. *See* Trial Tr. at 668-69. But even if the D.A.'s decision was based on its analysis of the constitutional probable cause requirement, that determination may have been incorrect or premised on the information obtained during the interview. Whether probable cause existed at the time of arrest does not turn on whether the detainee would be found guilty upon a weighing of all evidence ultimately discovered following a thorough investigation. *See Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989).

(1963)).  Supreme Court case law makes clear that, to be repugnant under the Fifth Amendment, a statement must result from "behavior of the State's law enforcement officials [that] was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined." *Rogers v. Richmond*, 365 U.S.534, 544 (1961).  There is no indication that Williams's statement was not "'the product of a rational intellect and a free will,'" *Mincey v. Arizona*, 437 U.S. 385, 398 (1978) (quoting *Townsend v. Sain*, 372 U.S. 293, 307 (1963) (internal quotation marks omitted)), and the state courts' denial of Williams's Fifth Amendment claim was therefore not unreasonable.

Williams was picked up in the late afternoon on June 30, 2003 and brought to the 60th Precinct. *Huntley* Tr. at 10-11, 26.  He was not questioned in the car on the way to the precinct.  *Id*. at 107-108.  After arriving at the precinct, Williams waited in an interview room for several hours until 9:00 p.m., when he was brought into the precinct's muster room to be interviewed.  *Huntley* Tr. at 73.  While he waited in the interview room, Williams was given cigarettes and food and was not questioned.  *Id*. at 73-74.  Kenny did not recall if Williams was handcuffed when he was brought into the muster room for the interview.  *Id*. at 74.  Kenny began the interview by reading Williams his *Miranda* rights.  *Id*. at 12, 74.  Kenny questioned Williams in the same tone of voice in which he testified, and both Heinrichs and Williams acted like gentlemen.  *Id*. at 85.

Based on this evidence, the Appellate Division rejected Williams's claim that his statement was involuntary.  *Williams*, 873 N.Y.S.2d at 72 (finding claim to be "without merit").  This determination was not "contrary to, or an unreasonable application of, a clearly established Federal law, as determined by the Supreme Court of the United States," or "based on an unreasonable determination of the facts in light of the evidence presented in the State Court

proceeding," 28 U.S.C. § 2254(d). "In determining whether a defendant's will was overborne in a particular case, [the Supreme] Court has assessed the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). An examination of the evidence presented at the *Huntley/Wade* hearing does not reveal any of the factors that the Supreme Court has found to suggest coercion. *See id.*, 412 U.S. at 226 ("Some of the factors taken into account have included the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." (citations omitted)); *see also, e.g.*, *Townsend*, 372 U.S. at 307-08 (confession coerced by administration of a "truth serum"), *overruled in part on other grounds*, *Keeney v. Tamayo Reyes*, 504 U.S. 1 (1992); *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (confession coerced where defendant was threatened with loss of her welfare benefits and of custody of her children); *Payne v. Arkansas*, 356 U.S. 560, 566-67 (1958) (confession coerced from a "mentally dull . . . youth," who was not informed of his rights, was "held incommunicado for three days," was "denied food for long periods," and was threatened with the specter of an angry mob); *Haley v. Ohio*, 332 U.S. 596, 598, 599-600 (1948) (confession coerced from "a mere child" not informed of his rights and questioned "through the dead of night by relays of police"); *Brown v. Mississippi*, 297 U.S. 278 (1936) (confession coerced by physical torture).

Accordingly, a writ of federal habeas corpus may not issue on the basis of Williams's claim that his statement to police was involuntary and should have been suppressed.

b.       *The Alleged* Miranda *Violation*

"The prophylactic rule of *Miranda* sweeps more broadly than the Fifth Amendment itself . . . and requires the suppression of some confessions that, while perhaps not actually involuntary, were obtained in the presumptively coercive environment of police custody."  *Tankleff*, 135 F.3d at 242.  Accordingly, even though Williams's statement was voluntary, it should have been suppressed if it was obtained in violation of *Miranda*.  *See New York v. Quarles*, 467 U.S. 649, 654 (1984) ("The Miranda Court . . . presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his Miranda rights and freely decides to forgo those rights." (footnote omitted)).  However, the state courts found that Williams's statement should not be suppressed in light of *Miranda*, and their determination was not unreasonable or contrary to Supreme Court precedent.

Pursuant to *Miranda*, police officers may not question a defendant without first informing him that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 348 U.S. at 478-79.  In Williams's case, Kenny and Heinrichs testified that Kenny read Williams his *Miranda* rights before either detective asked him any questions.  Trial Tr. at 12, 653.  Williams stated that he understood each warning, and that he was willing to answer Kenny's questions but was unwilling to write down or otherwise memorialize his statements.  *Id*. at 13-14.  A photocopy of the *Miranda* sheet from which Kenny read the warnings to Williams was admitted into evidence at the *Huntley*/*Wade* hearing; the sheet bore Kenny's signature and the signature of a second detective.  *Id*. at 12-13, 15, 28-29.  This evidence fully supports the

state courts' determination that Williams's statement should not be suppressed. Accordingly, no writ of federal habeas corpus may issue on the basis of an alleged *Miranda* violation.[20]

CONCLUSION

For the reasons stated above, the petition is denied. As Williams has failed to make a substantial showing that he was denied a constitutional right, no certificate of appealability shall issue.

So ordered.

John Gleeson, U.S.D.J.

Dated: January 11, 2011
      Brooklyn, New York

---

[20]    The Appellate Division did not state a reason for denying Williams's Fifth Amendment claim, other than that the claim was "without merit." *Williams*, 873 N.Y.S.2d at 71. Justice Gerges provided the following explanation for denying Williams's motion to suppress:

> Although defendant was not in custody at the time, and indeed left the precinct after making a statement, he was informed of his rights pursuant to *Miranda v. Arizona*, (384 US 436), and made a statement after knowingly, voluntarily and intelligently waiving these rights. The statement is admissible.

Decision Denying Mot. Suppress, 2**.**

    The determination that Williams was not in custody at the time of his arrest was unreasonable in light of the record and Supreme Court precedent. Indeed, the circumstances of Williams's detention and questioning are hard to distinguish from those described in *Dunaway v. New York*, in which the Supreme Court found that the defendant had been in custody for the purposes of *Miranda* analysis. *See Dunaway*, 442 U.S. 200; *see also Illinois v. Perkins*, 496 U.S. 292, 296 (1990) (*Miranda* warnings need not be given unless defendant is subject to "custodial interrogation"). In *Dunaway*,

> Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. He was never informed that he was 'free to go'; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody.

442 U.S. at 212. Both Heinrichs and Kenny testified that Williams was not free to leave the precinct once he was brought there on June 30, 2003, until he was released in the early hours of June 31. *Huntley* Tr. at 11; Trial Tr. at 663-64; 690-91.

    Nonetheless, even though Williams was in custody, Justice Gerges determined that Williams had been informed of his *Miranda* rights, and that determination was fully supported by the evidence.